IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LYNDA DEBARROS,                                    OPINION AND ORDER
                                          Case No. 6:11-cv-06116-AA
            Plaintiff,

     v.

WAL-MART STORES, INC.,

            Defendant.
————————————————————————

Andrew Lewinter
Andrew Lewinter, Attorney, P.C.
101 E. Broadway, Suite 220
Eugene, Oregon 97401

Cynthia Danforth
Attorney At Law
433 W. Tenth Avenue, Suite 201
Eugene, Oregon 97401
     Attorneys for plaintiff

Richard R. Meneghello
Erin O. Sweeney
Fisher & Phillips LLP

Page 1 - OPINION AND ORDER

111 SW Fifth Avenue, Suite 1250
Portland, Oregon 97204
        Attorneys for defendant

AIKEN, Chief Judge:

Plaintiff Lynda deBarros filed suit against defendant Wal-Mart
Stores, Inc., alleging a violation of the Family Medical Leave Act
(FMLA), 29 U.S.C. §§ 2615(a)(2) and (b).   Defendant moves for
summary judgment.   See Fed. R. Civ. P. 56(a).   This Court heard
oral argument on February 22, 2013.   Defendant's motion is DENIED.

### Factual Background

Plaintiff alleges that defendant disciplined and ultimately
terminated her, in violation of 29 U.S.C. § 2615(a)(2) and §
2615(b), due to plaintiff's previous initiation of an FMLA lawsuit
against defendant.

Plaintiff began working for defendant in 2000 as an hourly
Photo Associate.   Plaintiff was promoted in 2002 to the salaried
position of Photo Connection Center Manager in the Lebanon, Oregon
store.   Defendant eventually eliminated plaintiff's position and
plaintiff moved laterally into the position of Division 1 Assistant
Store Manager.   Plaintiff was then transferred to the Springfield,
Oregon store in 2007, maintaining her position as a Division 1
Assistant Store Manager.

In late 2007, plaintiff experienced health problems and took
an FMLA protected leave of absence.   Plaintiff returned to work in
January 2008.   In February 2008, plaintiff was demoted to an hourly

Page 2 - OPINION AND ORDER

associate position.    In November 2008, plaintiff filed a lawsuit against defendant (deBarros I), alleging that defendant violated the FMLA by demoting her after taking medical leave.    Plaintiff also named her store manager at the time, Kenneth Hutchison (Hutchison), as a defendant in that case.    The lawsuit settled in April 2010.    Pursuant to the settlement agreement, beginning June 7, 2010, plaintiff was reinstated to her previous position as a Division 1 Assistant Manager assigned to the Delta Oaks Store in Eugene, Oregon.

At the time of plaintiff's reinstatement, her direct supervisor was store manager Katrina Luther (Luther). Luther was on medical leave at the time of plaintiff's reinstatement and returned to work on July 13, 2010.  Luther and plaintiff had never met prior to Luther's return to work.

Defendant typically sends newly promoted assistant managers to an off-site multi-week program called the Assistant Manager Training Program.  Plaintiff did not receive this training when she first became an assistant manager.  Plaintiff requested enrollment in the Assistant Manager Training Program on at least two separate occasions.  Despite these requests, plaintiff was never sent to the Assistant Manager Training Program.  Instead, plaintiff received informal on-the-job training from her direct supervisors as well as computer based tutorials.

Defendant utilizes a four-level disciplinary procedure called

"Coaching for Improvement." Level one is a documented verbal coaching and level two is a written coaching. Level three is called a "Decision-Making Day," where the employee receives a paid day off of work intended to give him or her time to develop an action plan for improvement. The fourth and final step is termination. Defendant's policy further provides that the employer may skip any level if the employee's conduct warrants more severe discipline.

On July 15, 2010, two days after Luther's return to work, she met with plaintiff to discuss two problems with plaintiff's work performance: (1) plaintiff's failure to properly communicate instructions to the overnight assistant regarding fixture assembly; and (2) plaintiff's inappropriate reference to Luther when reprimanding a sales associate.

Luther was scheduled to take vacation and sent three e-mails to her management team prior to leaving. The three e-mails were dated July 22, 2010, July 23, 2010, and August 3, 2010. When Luther returned, plaintiff had not completed the tasks outlined in Luther's emails. Luther gave plaintiff a level one verbal coaching on August 12, 2010 to address her job performance.

Later that day, plaintiff sold a gun without following the proper gun sale procedure. Plaintiff received training specific to gun sales earlier that same day. Luther wrote a summary of the incident, but chose not to give plaintiff another coaching due to

plaintiff's verbal coaching earlier that day.

Thereafter, over the course of several weeks, Luther sent her management team a variety of e-mails with task assignments. Plaintiff failed to complete the tasks to Luther's satisfaction. Luther gave plaintiff a level two written coaching on September 5, 2010.   On September 15, 2010, Luther enrolled plaintiff in a Performance Improvement Plan (PIP) intended to clearly itemize the areas in which plaintiff was expected to improve.   The PIP contained periodic follow-up meeting dates.

Plaintiff and Luther met on October 23, 2010, for plaintiff's first PIP follow-up session.   Because she had not completed the expectations outlined in her PIP, plaintiff received a level three Decision-Making Day along with a coaching and an action plan for improvement.   The action plan gave plaintiff 30 days to improve her job performance, otherwise she would be subject to termination.

In mid-November 2010, Luther was transferred to another store and was replaced by Clinton Abbott (Abbott).   During the transition, Luther spoke briefly to Abbott about plaintiff's disciplinary status.   Abbott met with plaintiff for the first time on December 12, 2010, for plaintiff's second PIP follow-up session. During this meeting, Abbott outlined his expectations, including the improvements plaintiff would need to make to fulfill those expectations.

On January 5, 2011, an hourly associate, Kimberly Rogers

(Rogers) delivered a doctor's note to plaintiff that contained work restrictions. The parties dispute whether Rogers told plaintiff that her injury was work-related. Plaintiff allowed Rogers to continue working in her position without applying the work restrictions recommended in the doctor's note. Rogers continued to work for approximately three days until management discovered the error.

Abbott called defendant's central Human Resources (HR) department and spoke to HR Managers including David Fuller (Fuller) and Shana Flores-Rios (Flores-Rios). Flores-Rios was involved in the 2008 lawsuit, deBarros I. HR instructed Abbott to terminate plaintiff's employment. Abbott met with plaintiff on January 11, 2011, and informed her that her employment was terminated.

## Standard

Rule 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its existence might affect the outcome of the suit. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The materiality of a fact is determined by the substantive law on the issue. Id. The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." Playboy Enter., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002) (citing Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 410 (9th Cir. 1996)).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

The court must resolve all reasonable doubts as to the existence of genuine issues of material fact against the moving party and construe all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

### Discussion

Defendant moves for summary judgment on plaintiff's 29 U.S.C. § 2615(a)(2) discrimination claim and 29 U.S.C. § 2615(b) retaliation claim.

### I. Preliminary Matters

Initially, the parties dispute under which provisions of the FMLA plaintiff can bring her claims.  Additionally, this Court must

Page 7 - OPINION AND ORDER

determine whether the McDonnell Douglas burden-shifting framework should be applied.

The Ninth Circuit recognizes three types of claims under the FMLA: (1) interference claims, when an employer interferes with an employee's exercise of rights under the FMLA, 29 U.S.C. § 2651(a)(1); (2) discrimination claims, when an employer discriminates against an employee for opposing any practice prohibited by the FMLA, 29 U.S.C. § 2615(a)(2); and (3) retaliation claims, when an employer discriminates against an employee for instituting or participating in proceedings or inquiries brought under FMLA, 29 U.S.C. § 2615(b). Benz v. West Linn Paper Co., 803 F. Supp. 2d 1231, 1249 (D. Or. 2011) (citing Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001)).

Defendant concedes that plaintiff's claim is appropriately brought as a retaliation claim under 29 U.S.C § 2615(b); however, defendant argues that plaintiff cannot establish an additional discrimination claim under 29 U.S.C. § 2615(a)(2) for the same protected activity. Under 29 U.S.C. § 2615(a)(2), it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Defendant relies on the United States Equal Employment Opportunity Commission's (EEOC) Compliance Manual, which defines "opposition" as when "an individual explicitly or implicitly communicates to his or her

employer or other covered entity a belief that its activity constitutes a form of discrimination that is covered by any of the statutes enforced by the EEOC." Def.'s Mem. in Supp. of Mot. for Summ. J. 27; E.E.O.C. Compl. Man. § 8-II(B)(1) (June 2006). Defendant infers from this definition that § 2615(a)(2) is intended to protect internal employment complaints, while § 2615(b) is intended to protect external complaints or charges. This Court disagrees with defendant's interpretation of the statutory language.

The plain language of § 2615(a)(2) indicates that the statute prohibits discrimination for an employee opposing an employer's violation of the FMLA. Whereas § 2615(b) prohibits discrimination against an employee for his or her participation in an enforcement proceeding. The facts in this case involve conduct prohibited by both of these sections. Therefore, the case is appropriately brought as two claims.

The Ninth Circuit defines the standard of proof for interference claims brought under § 2615(a)(1) as a preponderance of the evidence, whereby the plaintiff must prove that the FMLA-protected leave constituted a negative factor in the employer's decision to terminate or reinstate to a non-equivalent position. Bachelder, 259 F.3d at 1125; Shepard v. City of Portland, 829 F. Supp. 2d 940 (D. Or. 2011). The Ninth Circuit has not, however, provided the standard that should be applied to discrimination

claims brought under § 2615(a)(2). <u>Xin Liu v. Amway Corp.</u>, 347 F.
3d 1125, 1136 n.10 (9th Cir. 2003). As such, in the absence of
direct evidence, it is this District's practice to apply the
burden-shifting framework set forth in <u>McDonnell Douglas</u>[1] to §
2615(a)(2) discrimination claims. <u>See, e.g.</u>, <u>Rogers v. Or. Trail
Elec. Consumers Coop., Inc.</u>, 2012 WL 1635127, *18 (D. Or. May 8,
2012) (citing <u>Price v. Multnomah Cnty.</u>, 132 F. Supp. 2d 1290, 1296
(D. Or. 2001)).

Nonetheless, this Court has not found, nor have the parties
cited to, authority that directs this Court to apply the <u>McDonnell
Douglas</u> burden-shifting framework to § 2615(b) retaliation claims.
The First Circuit, however, has held that the <u>McDonnell Douglas</u>
burden-shifting framework applies to claims where the employer's
motive is relevant. <u>Hodgens v. Gen. Dynamics Corp.</u>, 144 F.3d 151,
160 (1st Cir. 1998). The First Circuit explains that the <u>McDonnell
Douglas</u> test is intended for claims where the court must analyze
whether the employer took the adverse action because of a
prohibited reason or for a legitimate nondiscriminatory reason.
<u>Id.</u> Following this logic, the District of Oregon held that the
employer's motive is not relevant to interference claims under §
2615(a)(1); however, the employer's motive is relevant to
discrimination claims under § 2615(a)(2) and therefore the

---

[1] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 800-06
(1973).

Page 10 - OPINION AND ORDER

<u>McDonnell Douglas</u> framework should be applied to discrimination claims. <u>Price</u>, 132 F. Supp. 2d at 1296.

Likewise, the employer's motive is also relevant to retaliation claims brought under § 2615(b). Therefore, the <u>McDonnell Douglas</u> framework is applicable to retaliation claims. As such, regardless of whether plaintiff's claim falls under § 2615(a)(2) or § 2615(b), the <u>McDonnell Douglass</u> analysis applies.

## II. Merits of Plaintiff's Claim

Under <u>McDonnell Douglas</u>, once a plaintiff demonstrates a prima facie case of retaliation, and in the absence of direct evidence of discrimination, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. <u>Price</u>, 132 F. Supp. 2d at 1296. If successful, the burden returns to plaintiff to produce evidence that the articulated reason is a pretext for retaliation. <u>Id.</u>

### A. Direct Evidence

Plaintiff first contends that summary judgment is improper because she can prove her case through direct evidence. A plaintiff may establish that retaliation motivated an employer's adverse employment action through direct evidence alone. <u>Cordova v. State Farm Ins. Co.</u>, 124 F.3d 1145, 1148-49 (9th Cir. 1997). If plaintiff establishes a prima facie case by introducing direct evidence, she has necessarily raised a genuine issue of material fact and she need not satisfy the <u>McDonnell Douglas</u> burden-shifting

test.  Id. (citing Wallis v. J.R. Simplot Co., 26 F.3d 885 (9th Cir. 1994)).

Plaintiff asserts that on August 12, 2010, during her first written coaching, Luther stated to co-manager Cindy Wilson (Wilson), "I'll always take care of my baby brother, Ken." Lewinter Decl. Ex. A (deBarros Dep.); 86:12-23; deBarros Decl. ¶ 16.  Plaintiff contends that this statement was in reference to previous manager Hutchison, a named plaintiff in deBarros I, and is direct evidence of Luther's intention to retaliate against plaintiff for her previous lawsuit.

This Court finds that this statement does not constitute direct evidence of discrimination or retaliation.  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." Vasquez v. Cnty. of L.A., 349 F.3d 634, 640 (9th Cir. 2003) (quoting Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998)) (internal quotation marks and alteration omitted).  The Ninth Circuit has held that "a stray remark that is uttered in an ambivalent manner and is not tied directly to the plaintiff's termination is insufficient to create an inference of discriminatory motive." Hartung v. Cae Newnes, Inc., 229 F. Supp. 2d 1093, 1100 (D. Or. 2002) (citing Merrick v. Farmers Ins. Grp., 892 F. 2d 1434, 1438-39 (9th Cir. 1990)).  Applying this test, the Ninth Circuit held that the statement, "we don't necessarily like grey hair" in an age

discrimination case failed to create an inference of discrimination, as it was an ambivalent statement not tied to plaintiff's termination. Nesbit v. Pepsico, Inc., 994 F. 2d 703, 705 (9th Cir. 1993). The Ninth Circuit similarly held a manager's reference to older employees as "old timers" was circumstantial evidence insufficient to establish a discriminatory motive at the summary judgment stage. Nidds v. Schindler Elevator Corp., 113 F. 3d 912, 918-19 (9th Cir. 1996), cert. denied, 522 U.S. 950 (1997).

Here, Luther's comment is ambivalent and not directly related to plaintiff's employment. Furthermore, Luther was not the manager at the time of plaintiff's termination and was not involved in the decision to terminate plaintiff. Sweeney Reply Decl. Ex. B (Luther Dep.), 58:1-16; Luther Decl. ¶ 2; Abbott Decl. ¶ 2, 15. The levels of inferences imbedded in Luther's statement make it too attenuated to be considered direct evidence. The statement may, however, be considered as circumstantial evidence. As such, the discussion now turns to whether plaintiff is able to establish her prima facie case under McDonnell Douglas.

**B. Circumstantial Evidence**

In the absence of direct evidence, the court may rely on circumstantial evidence, but must apply the burden-shifting test articulated in McDonnell Douglas. Rogers, 2012 WL 1635127 at *12.

**i. Prima Facie Case**

To establish a prima facie case, plaintiff must show that (1)

she was involved in a protected activity; (2) she was adversely
affected by an employment decision; and (3) there is a causal
connection between the two actions. Porter v. Cal. Dept. Of Corr.,
419 F.3d 885, 894 (9th Cir. 2004).  At the summary judgment stage,
the degree of proof needed is minimal and does not need to rise to
the level of a preponderance of the evidence.  Lyons v. Eng., 307
F.3d 1092, 1112 (9th Cir. 2002).  The plaintiff need only offer
evidence which "gives rise to an inference of unlawful
discrimination." Id. (quoting Lowe v. City of Monrovia, 775 F.2d
998, 1009 (9th Cir. 1985)).

Plaintiff contends that she was adversely affected by
defendant's decision to discipline her and terminate her
employment, and that defendant's decision was in retaliation for
plaintiff's previous FMLA-related lawsuit, deBarros I.  This Court
finds that plaintiff is able to establish the three elements of her
prima facie case.

### a. Protected Activity

Here, the protected activity was plaintiff's original lawsuit,
deBarros I, filed November 2008.  DeBarros Decl. ¶ 7.

### b. Adverse Action

The Ninth Circuit has held that "not every employment decision
amounts to an adverse employment action," further stating that
"only non-trivial employment actions that would deter reasonable
employees from complaining about Title VII violations" are

actionable.  Brooks v. City of San Mateo, 229 F. 3d 917, 928 (9th Cir. 2000).  Thus, an adverse employment action is any action that is "reasonably likely to deter employees from engaging in protected activity." Ray v. Henderson, 217 F. 3d 1234, 1243 (9th Cir. 2000). A variety of actions have met this definition, including: termination, negative employment references, undeserved negative performance reviews, and failure to be promoted or to be considered for promotions.  Brooks, 214 F. 3d at 1093.

Plaintiff argues that her first meeting with Luther on July 15, 2010, and all subsequent coachings, should be considered adverse employment actions.  This Court disagrees.  An undeserved negative performance review may constitute an adverse employment action; however, in this case, the record does not contain evidence that Luther had knowledge of deBarros I on July 15, 2010.  Id. Without knowledge of deBarros I, Luther's meeting with plaintiff on July 15, 2010, cannot be considered retaliation or an undeserved review, and it is therefore not an adverse employment action. Furthermore, any coachings or discipline that occurred by Luther prior to her knowledge of deBarros I were not undeserved negative reviews, and were not adverse employment actions.

The parties disagree as to when Luther gained knowledge of deBarros I.  The record, however, contains evidence that when viewed in the light most favorable to plaintiff, may indicate that Luther knew about deBarros I on August 12, 2010.  Luther made the

Page 15 - OPINION AND ORDER

comment during a disciplinary coaching on August 12, 2010, "I'll always take care of my baby brother, Ken," referring to Hutchison. Lewinter Decl. Ex. A (deBarros Dep.) 86:14-23. Plaintiff argues that this comment indicates not only that Luther knew about deBarros I on that date, but that the statement is also evidence of clear retaliatory intent.

Viewing the evidence in the light most favorable to Plaintiff, Luther may have had knowledge of deBarros I on August 12, 2010, and therefore the disciplinary coaching that occurred on that day may amount to a retaliatory adverse employment action. Likewise, all subsequent disciplinary employment actions may also be considered adverse employment actions.

### c. Causal Connection

Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of surrounding circumstances. Conzalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003). A causal connection can be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activity or the proximity in time between the protected activity and the retaliatory employment decision. Howard v. Milwaukie Convalescent Hosp., Inc., 2008 WL 4117167, *4 (D. Or. August 25, 2008), Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

## 1. Employer's Knowledge

The causal connection between the protected activity and the employer's adverse action can be inferred through circumstantial evidence such as the employer's knowledge of the protected activity. Yartzoff, 809 F.2d at 1376.

Plaintiff argues that the primary decision makers involved in her discipline and termination knew about deBarros I and that their actions were therefore made in retaliation. Plaintiff focuses her argument on three people: her first supervisor, Luther; her second supervisor, Abbott; and an HR Manager, Flores-Rios. This Court finds that plaintiff's arguments with regards to Abbott and Flores-Rios are not supported by the record, however, her argument with regards to Luther is supported by the record.

Abbott was plaintiff's direct supervisor at the time of her termination. Sweeney Decl. Ex. G (Abbott Dep.), 5:22. Based on Abbott's testimony, he had no knowledge of deBarros I at any time. Id. at 51:10-25, 52:1-5. Abbott's lack of knowledge of deBarros I is undisputed. Plaintiff does, however, argue that Abbott was somehow tainted by Luther during Luther and Abbott's transition. Plaintiff's argument is not supported by the record. Furthermore, the HR department, not Abbott, made the decision to terminate plaintiff based on plaintiff's already advanced status in the four-level disciplinary procedure. Lewinter Decl. Ex. F (Abbott Dep.) 43:9-11, 44:20-24.

Page 17 - OPINION AND ORDER

Flores-Rios was an HR Manager at the time of plaintiff's termination. She was also a witness in the first lawsuit, deBarros I. Plaintiff argues that Flores-Rios had knowledge of deBarros I and retaliated against plaintiff in two ways: (1) by preventing plaintiff from attending the Assistant Manager Training Program, and (2) by deciding to terminate plaintiff's employment on January 11, 2011. Plaintiff's arguments with regards to Flores-Rios are not supported by the record.

While Flores-Rios did work in the HR Department, there is no indication that she was personally involved in determining whether plaintiff should attend the Assistant Manager Training Program. While she was one of many people involved in the decision to terminate plaintiff, Lewinter Decl. Ex. F (Abbott Dep.) 44:2-13, her involvement is irrelevant because Abbott did not refer to plaintiff by name during his telephone conversations with HR about plaintiff's termination. Sweeney Reply Decl. Ex. C (Abbott Dep.) 47:1-9, 47:21-25, 48:1-12.

> [Flores-Rios] and I never directly spoke about Lynda [deBarros]. We talked about a salary member of management with coachings that violated a policy. . .There's no reason to engage in that kind of dialogue. It was more of a structural-based decision on what happens next. . .I don't remember even discussing the name of the associate with Shana [Flores-Rios]. It was more on the situation with the policy violation and an associate that had coachings. What happens next? It's termination. I don't even remember discussing who the assistant manager was or any background to the associate other than that there was [sic] coachings already in the system.

Id. at 47:2-9, 47:24-25, 48:1-6.

Plaintiff does not dispute Abbott's lack of specific reference to plaintiff during his conversation with Flores-Rios about termination.    Therefore, while Flores-Rios was involved in the decision to terminate plaintiff, the record does not indicate that she knew her decision concerned plaintiff specifically.

Luther testified in her deposition that she was aware of plaintiff's previous lawsuit against defendant, deBarros I, but that she did not know about it immediately.    Sweeney Decl. Ex. F (Luther Dep.), 35:25, 36:1-19.    Luther said she found out about the lawsuit "approximately two or three months" after returning to work from her leave of absence, which was on July 13, 2010.    Id. 35:25, 36: 1-25, 37:1-11; Luther Decl. ¶ 3.    Therefore, according to her testimony, Luther first learned about deBarros I, at the earliest, in mid-September 2010.

Plaintiff argues that Luther's lack of knowledge is implausible given that assistant managers who Luther supervised were aware of deBarros I.    Plaintiff also argues that Luther must have known about deBarros I earlier than mid-September 2010 because of her August 12, 2010 statement, "I'll always take care of my baby brother, Ken."    Lewinter Decl. Ex. A (deBarros Dep.) 86:14-23.    As discussed above, this statement is not direct evidence but can be considered as circumstantial evidence.    In the light most favorable to plaintiff, this statement may be construed as evidence that

Page 19 - OPINION AND ORDER

Luther had knowledge of <u>deBarros I</u> on August 12, 2010.

Therefore, plaintiff is able to establish a causal connection between the protected activity and the employer's adverse action through circumstantial evidence of Luther's knowledge of <u>deBarros I</u>.

## 2. Temporal Proximity

Plaintiff is also able to establish a causal connection through evidence of a close temporal proximity.  Close temporal proximity between the protected activity and the adverse employment action may provide supporting evidence of a causal connection.  <u>Xin Liu</u>, 347 F.3d at 1137.  The Ninth Circuit has held that the causal link "can be inferred from timing alone" when there is a close proximity between the two activities.  <u>Thomas v. City of Beaverton</u>, 379 F.3d 802, 812 (9th Cir. 2004).

Here, plaintiff filed <u>deBarros I</u> in November 2008.  The lawsuit was settled on April 30, 2010 and dismissed May 20, 2010.  Plaintiff was reinstated as Division I Assistant Manager at the Delta Oaks store on June 7, 2010.  Luther was on medical leave at the time of plaintiff's reinstatement and returned to work on July 13, 2010.  Luther first spoke to plaintiff about problems on July 15, 2010.  Luther gave plaintiff a verbal coaching on August 12, 2010 and a written coaching on September 5, 2010.  Plaintiff received a Decision-Making Day on October 29, 2010.  In mid-November, Luther was transferred to another store and was replaced

by Abbott.  Abbott gave plaintiff a coaching on December 12, 2010.
Plaintiff was terminated on January 11, 2011.

Plaintiff argues that there exists a close temporal proximity
sufficient to establish an inference of causation.  Plaintiff
contends that the protected activity occurred on May 20, 2010, the
date deBarros I was dismissed.  Plaintiff does not cite to any
authority as to why she chose that date as the start of the
temporal proximity analysis.  Plaintiff further argues that this
Court "should disregard the time period between when plaintiff
filed her Stipulation of Dismissal in deBarros I on May 19, 2010
and July 13, 2010, as defendant could not have disciplined
plaintiff during that time" because Luther did not return to work
until July 13, 2010.  Plaintiff does not, however, explain why
defendant could not have disciplined her in Luther's absence.
Plaintiff also argues that the first adverse employment action
occurred on July 15, 2010 when Luther spoke to plaintiff about
performance problems.  Based on plaintiff's calculation, the
temporal proximity between the protected activity and defendant's
adverse action is only two days, thereby creating an inference of
causation.

This Court disagrees with plaintiff's method of calculating
the temporal proximity.  The temporal proximity analysis generally
measures the time between the protected activity and the adverse
employment action.  Xin Liu, 347 F. 3d at 1137, Hodgens, 144 F.3d

Page 21 – OPINION AND ORDER

at 168. The protected activity for a claim brought under 29 U.S.C. §2615(a)(2) is "opposing any practice made unlawful by this subchapter"; under § 2615(b) a protected activity occurs when the individual has "instituted any proceeding." It is undisputed that in this case, the protected activity occurred when plaintiff filed her lawsuit in November 2008. The problem, however, with using November 2008 as the start for the temporal proximity analysis, is that defendant did not have an opportunity to retaliate against plaintiff until plaintiff was reinstated as an assistant manager. Therefore, an appropriate temporal proximity analysis should begin on June 7, 2010, the date plaintiff was reinstated as an assistant manager.

As discussed above, this Court does not construe the July 15, 2010 meeting between plaintiff and Luther to be an adverse employment action. A retaliatory adverse employment action by Luther could have only occurred after Luther gained knowledge of <u>debarros I</u>. The first evidence that Luther had knowledge of <u>deBarros I</u> was on August 12, 2010 when Luther made the statement, "I'll always take care of my baby brother, Ken." Lewinter Decl. Ex. A (deBarros Dep.) 86:14-23. Therefore, the first retaliatory adverse employment action occurred at the disciplinary coaching on August 12, 2010.

The length of time between plaintiff's reinstatement, June 7, 2010, and the coaching on August 12, 2010 is just over two months.

Page 22 - OPINION AND ORDER

The length of time between plaintiff's reinstatement, June 7, 2010, and her ultimate discharge, January 11, 2010, is seven months. The Ninth Circuit has held that up to three months between the protected activity and the adverse employment action was sufficient to establish causation. See Yartzoff, 809 F.2d at 1376. Other districts have held that an even longer amount of time between the protected activity and the adverse employment action was sufficient to infer causation. See Hochstadt v. Worcester Found. for Experimental Biology, Inc., 425 F. Supp. 318, 324-325 (D. Mass. 1976) (holding that discharge six months after EEOC settlement and one month after plaintiff made an internal complaint satisfies the causation requirement), aff'd, 545 F.2d 222 (1st Cir. 1976).

This Court finds that the short timeline between plaintiff's reinstatement, her disciplinary coaching on August 12, 2010, and her ultimate discharge is sufficient to infer a causal connection. Thus, plaintiff set forth sufficient evidence on which to establish a prima facie case.

### ii. Nondiscriminatory Reason

The McDonnell Douglas analysis now shifts the burden to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 800. The defendant must clearly set forth reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination did not cause their actions. St. Mary's

Page 23 - OPINION AND ORDER

Honor Ctr. v. Hicks, 509 U.S. 502, 502 (1993). Defendant has offered substantial evidence of legitimate, nondiscriminatory reasons for the adverse employment actions.

As discussed above, defendant utilizes a four-level disciplinary policy titled Coaching for Improvement. Luther Decl. ¶ 4. As an employee passes through the levels each step is documented, including the reason the employee was disciplined, the recommendations made to the employee by her supervisor, and a plan for how the recommendations will be implemented.

Here, plaintiff's discipline was well documented at every step. On July 15, 2010, Luther met with plaintiff to discuss why plaintiff, after being told to install a fixture, had failed to do so and why plaintiff had inappropriately used Luther's name in discussions with another associate. Luther Decl. ¶ 5. Further, at this time, Luther discussed her expectations regarding plaintiff's job performance. Id.

Defendant provided copies of e-mails written by Luther to her staff, including plaintiff, on July 22, 2010, July 23, 2010, and August 3, 2010, outlining plaintiff's assignments. Id. at ¶ 6. Plaintiff did not complete the assignments listed in the e-mail; therefore, she received a level one verbal coaching from Luther on August 12, 2010. Id. The verbal coaching also provided plaintiff with suggestions for improvement. Id. Later that same day, despite having recently undergone the firearms sales training,

Page 24 - OPINION AND ORDER

plaintiff sold a firearm in violation of defendant's firearm sales policy. Id. at ¶ 8.

Defendant also included copies of one e-mail dated August 18, 2010, and two dated August 20, 2010, written by Luther to her staff, including plaintiff, listing their assignments. Id. at ¶ 10. Plaintiff again did not complete the assignments listed in the e-mails and was issued a level two written coaching by Luther on September 5, 2010. Id. In the written coaching, Luther outlined her expectations and made recommendations for improvement. Id. Luther decided to enlist plaintiff in a PIP, which was intended to highlight the areas in which plaintiff was expected to improve. Id. at ¶ 11. PIPs are not mandatory under defendant's disciplinary policy, but they are considered helpful to improve job performance. Id.

On October 23, 2010, Luther conducted a follow-up session with plaintiff regarding her PIP status. Id. at 13. Plaintiff had not completed the expectations listed in her PIP, so Luther moved to level three, a Decision-Making Day, coaching, and action plan. Id. at ¶ 14. At this time, plaintiff was told that if her behavior continued, the next level of action was termination. Id.

On November 13, 2010, Luther transferred to another store and Abbott transferred to plaintiff's store, becoming plaintiff's immediate supervisor. Abbott Decl. ¶ 3. Abbott met with plaintiff on December 12, 2010 to conduct a follow-up session on plaintiff's

Page 25 - OPINION AND ORDER

PIP.  Id. at ¶ 4.  At this meeting, Abbott summarized his observations of plaintiff's performance, his expectations for her future performance, and the next steps she must take to fulfill those expectations.  Id.

On January 5, 2011, hourly associate Rogers informed plaintiff of a work-related injury and gave plaintiff a doctor's note containing recommended work restrictions.  Sweeney Decl. Ex. I (Rogers Dep.) 34:8-11.  Plaintiff failed to properly report Rogers' work-related injury and allowed Rogers to continue working without applying the work restrictions, in violation of defendant's policy. Abbott Decl. ¶ 6.  Abbott discussed plaintiff's disciplinary record with HR managers without referencing plaintiff by name and the decision was made to terminate her employment.  Sweeney Reply Decl. Ex. C. (Abbott Dep.) 47:1-9.  Abbott met with plaintiff on January 11, 2011 and terminated her employment.  Abbott Decl. ¶ 15.

The foregoing discussion reveals that defendant provided sufficient evidence explaining and justifying plaintiff's progression through the four-level disciplinary process.  Defendant has therefore met its burden in articulating a legitimate, non-discriminatory reason for plaintiff's discipline and termination.

### iii. Pretext for Retaliation

Under McDonnell Douglas, the burden now shifts back to plaintiff to produce evidence that defendant's articulated reason is pretext for retaliation.  Price, 132 F. Supp. 2d at 1296.  The

plaintiff "can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Lyons, 307 F.3d at 1113 (quoting Godwin, 150 F.3d at 1220-22). The court considers both direct and circumstantial evidence; however, the circumstantial evidence must be specific and substantial in order to survive summary judgement. Id. (quoting Bergene v. Salt River Project Agricultural Improvement and Power Dist., 272 F.3d 1136, 1142 (9th Cir. 2001)).

Construing the evidence in the light most favorable to plaintiff, a reasonable juror may conclude that the reasons articulated by defendant are pretext for retaliation.

Plaintiff argues that Luther began retaliating against her almost immediately upon Luther's return to work on July 13, 2010. While there is no evidence in the record to indicate that Luther knew about deBarros I on July 13, 2010, the record contains evidence that, when viewed in the light most favorable to plaintiff, may indicate that Luther knew about deBarros I on August 12, 2010 and immediately engaged in retaliatory conduct. Plaintiff asserts that on August 12, 2010, during her first written coaching, Luther stated, "I'll always take care of my baby brother, Ken." Lewinter Decl. Ex. A (deBarros Dep.); 86:12-23; deBarros Decl. ¶ 16. This statement is not considered as direct evidence, but may

be considered as circumstantial evidence of defendant's pretext for retaliation.

Plaintiff also argues that defendant prevented her from succeeding in the workplace by repeatedly refusing her requests to attend the Assistant Managers Training Program, citing Arjangrad v. JPMorgan Chase Bank, N.A., 2012 WL 1189750, *19 (D. Or. Apr. 9, 2012). In Arjangrad, plaintiff revealed her national origin to her supervisor and her supervisor's behavior underwent a drastic change. Id. After the disclosure, Arjangrad's supervisor failed to inform her of crucial policies and refused her requests for additional training. Id. The employer's refusals to provide Arjangrad with the necessary training led to poor performance evaluations and, ultimately, her discharge. Id.

Here, plaintiff asked repeatedly for additional training that she did not receive. On one occasion, plaintiff specifically asked Luther if she could attend the Assistant Manager Training Program, to which Luther replied that it would be a waste of time. Lewinter Decl. Ex. A (deBarros Dep.), 29:7-25. Plaintiff also wrote two letters to Luther, one dated October 27, 2010 and another dated October 30, 2010, in which she expressed frustration for the lack of response to her repeated requests for training. DeBarros Decl. ¶¶ 14, 20. Ex. A, D. The record contains evidence that the Assistant Manager Training Program covered subjects for which plaintiff was disciplined, which indicates that had plaintiff

Page 28 - OPINION AND ORDER

attended the program, she may have received the training necessary
to succeed in her job.  Lewinter Decl. Ex. C (Zurita Lara Dep.),
10:12-25, 11:1-12.

Plaintiff also contends that defendant permitted similarly
situated employees to receive the Assistant Manager Training
Program.  Pretext for retaliation may be shown through evidence
that an employer treated similarly situated employees outside of
plaintiff's protected class more favorably than plaintiff.  See
McDonnell Douglas, 411 U.S. at 804.  Employees are similarly
situated when they have similar jobs and display similar conduct.
Vasquez, 349 F.3d at 641 (citing Ward v. Procter & Gamble Paper
Prods. Co., 111 F.3d 558, 560-61 (8th Cir. 1999)). Plaintiff notes
that Luther promoted four or five hourly associates to the position
of assistant manager in 2010 and that all of those employees were
given the opportunity to attend the Assistant Manager Training
Program.  Lewinter Decl. Ex. D (Luther Dep.) 33:10-18.  In
contrast, Luther denied plaintiff's requests to attend this same
training program.  Lewinter Decl. Ex. A (deBarros Dep.), 29:7-25;
DeBarros Decl. ¶¶ 14, 20. Ex. A, D.

Considering the evidence in the light most favorable to
plaintiff, this Court finds that the close temporal proximity
between plaintiff's supervisor learning about deBarros I, and
plaintiff being denied training which ultimately led to her
termination, creates an inference of retaliatory intent.  This

inference is strengthened by evidence indicating that defendant offered the same training program to other employees promoted to plaintiff's same position. Therefore, plaintiff has met her burden as required by McDonnell Douglas in establishing that defendant's articulated reason for the adverse employment action was possibly pretext for retaliation.

## **Conclusion**

For the reasons set forth above, defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated this ___ day of June 2013.


_____
Ann Aiken
United States District Judge

Page 30 - OPINION AND ORDER